_____UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-80217-CIV-HURLEY

CURTIS SHERROD,

      Plaintiff,

vs.

THE SCHOOL BOARD OF PALM BEACH COUNTY,
ARTHUR JOHNSON, individually,
GLORIA CRUTCHFIELD, individually,
VICKI L. EVANS-PARE, individually and
JEAN MARIE MIDDLETON, individually,

      Defendants.

_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the court on the parties' cross-motions for summary judgment directed, *inter alia*, to plaintiff's claim that certain defendants retaliated against him for engaging in speech protected by the First Amendment [DE# 93, 101, 106]. Following oral argument upon the motions, the court invited and received supplemental evidentiary submissions and briefs directed to the issue of whether the public employee speech in question enjoys First Amendment protection as speech made "as a citizen" on a "matter of public concern," as those concepts have been refined in *Garcetti v Ceballos,* 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed.2d 689 (2006).

Having reviewed the parties' respective briefs and supplemental evidentiary submissions, the court concludes that the controversial speech by Mr. Sherrod, a public high school history teacher who spoke at several school board meetings to voice his criticism of perceived deficiencies in the School District of Palm Beach County's implementation of a Florida statute requiring curriculum infusion of African and African-American history, constitutes speech made "as a citizen"

on a "matter of public concern" and hence enjoys constitutional protection.  Accordingly, with one exception detailed below,  the court shall deny  the defendants'  motion  for summary judgment on the plaintiff's First Amendment retaliation claim (Count 2).

As to the  remaining  claims,  the  court  shall  grant  the defendants'  motion  for  summary judgment on the claim that defendants Crutchfield and the School Board  violated Mr. Sherrod's procedural due process and equal protection  rights by prematurely  terminating his employment before completion of a  remedial  site assistance plan (Count 1).  Also, the court shall grant the defendants' motion for summary judgment on the claim that  defendants  Vicki Evans- Pare and Jean Marie  Middleton,  lawyers representing  the  School Board  in prior litigation, violated Mr. Sherrod's  procedural due process rights by failing to disclose an employment/address change of a key witness before and during  original trial proceedings  on his First Amendment retaliation claim (Count 3).

### I. Fact Background & Procedural History[1]

 Curtis  Sherrod ("Mr. Sherrod") began working as a history teacher for the Palm Beach County School District ("the District") in  the 1993-94 academic year.  From June, 1995  to May, 2001,  he taught world history at Olympic Heights High School in  Boca Raton, Florida, where he consistently received  "satisfactory" performance evaluations up through the beginning of the 2001-2002 academic year.

On July 15, 2001,  a local newspaper  published  an article  questioning the adequacy of  the District's implementation  of a recently enacted state statute mandating infusion of African and

---

[1]  The material facts are drawn from the plaintiff's complaints in this action and the parties' Local 7.5 statements, unless otherwise noted (e.g. trial testimony from *Sherrod I*) [DE# 101-1].

African-American history into the District's  history curriculum. The article, printed in The Palm

Beach Post[2], read in pertinent part:

> Seven years after the state ordered educators to teach specific lessons in African-American History, officials believe only 10 percent of Palm Beach County's teachers are doing it.  Debbye Raing, program planner in the school district's Equal Opportunity Department, made the ten percent estimate Thursday morning during a week long training course on how to use an African and African-American curriculum developed by her office....  Currently it's up to teachers and principals to make sure students are learning the material.  The depth of instruction depends on the school.  School board member Dr. Debbie Robinson wants it to be taught more consistently.   She suggested the countywide exam, which she wants to be a requirement for graduation.

Mr. Sherrod echoed this concern in a letter dated September 3, 2001 to Esther Bulger,  Social

Sciences Program Director for the School District of Palm Beach County, in which he complained

that the newly proposed  district-wide history examination failed to adequately measure the results

of the District's  African and African-American history infusion efforts.

According to Mr. Sherrod, the next  day,  Fran Giblin, the principal  at Olympic Heights,

appeared in his classroom for the first time in six years for a formal observation.   Principal Giblin

later called Sherrod to task for infusing too much African and African-American history into his

classroom presentations.   According to Mr. Sherrod, he began infusing African and African-

American content into his curriculum as soon as the statute was enacted, and understood that state

law required him to  expand the curriculum in this fashion.

On October 15, 2001, Mr. Sherrod wrote a  letter to then School Board Chairman Tom

Lynch,  with  copies  to  other  Board  members,  questioning  the  adequacy  of  the  District's

implementation of  the infusion statute.  Next, on February 2, 2002, he submitted a petition to the

---

[2]  *"Educators Turn Focus Onto Black History*," K. Miller, The Palm Beach Post, July 15, 2001.

School Board requesting an evidentiary hearing upon the issue.

On March 11, 2002, Debbie Raing, the District's program planner for African and African History Studies, submitted a formal report, based on classroom observations, confirming that Mr. Sherrod was teaching within the District's world history curriculum guidelines. The record is unclear as to whether this formal observation was made at request of Mr. Sherrod, Principal Giblin or some other school administrator, or whether it was simply made in the ordinary course of performance review.

Soon after, Mr. Sherrod began making regular appearances at school board meetings to press his concerns about his perception of the District's inadequate infusion efforts. For example, on April 17, 2002, Mr. Sherrod stated:

> My name is Curtis Sherrod. I'm here because you have a problem. [Statute] 233.061 was passed in 1994. The Palm Beach County School Board has spent thousands of dollars to implement the program, which for those who don't know is the inclusion of African, African- American history from grades K5 through twelve. Now, I'm still getting tenth graders who the only African Americans, Africans period they've heard about is either Martin Luther King or Frederick Douglas. Maybe some even heard of Malcolm X .... They're teaching black children that basically their history started on slave ships ... I advise you to have Mr. Johnson settle this matter and let's work to put together a program where all children can learn.

On May 16, 2002, Mr. Sherrod received his first unsatisfactory performance evaluation at Olympic Heights from then Vice-Principal Christine Hall. This, in turn, caused the District to place him on a remedial teaching performance plan, known as a "site assistance plan" or "SAP." According to Mr. Sherrod, the District intentionally structured his SAP so that he had "no reasonable expectation of success," providing cover for a "set up" to eliminate him allegedly orchestrated by Principal Giblin. In August 2002, the District transferred Mr. Sherrod from Olympic Heights in Boca Raton to Palm Beach Lakes High School in West Palm Beach where he

4

was assigned to serve as a hall monitor.

On August 14, 2002, Mr. Sherrod filed "*Sherrod I*," his initial §1983 suit against the School District of Palm Beach County and various district employees involved in the decision to transfer and demote him, contending that it constituted a retaliatory action designed to punish him for publicly criticizing the District's poor performance in implementing the African and African-American history infusion statute.

On September 18, 2002, Sherrod again spoke at a public school board meeting and stated:

My name is Curtis Sherrod. Until this year I was the world history teacher at Olympic Heights in Boca Raton, Florida when I was fourteen (sic). In 2002 I filed a (inaudible) ten point five million dollar suit alleging retaliation for exercising my right to freedom of speech against my employer, the Palm Beach County School District.

I am presently assigned to Palm Beach Lakes High School in West Palm Beach, Florida where the taxpayers of Palm Beach County are now paying me forty thousand dollars plus a year to carry a walkie talkie and tell kids to tuck in their shirttails in, while the white teacher with half my expertise is teaching my classes....

The suit that I filed is not just about me or the ridiculous trumped up charges against me .... This is about something much more important. This is about study after study find (sic) the African -American children are even or ahead of the white counterparts, yet by the time they reach third grade, they are falling behind and don't won't (sic) to go to school anymore. That's why I refuse to back down and teach the standard white supremacist version of World History. ...

This is about teachers and administrators who have to be educated in the racist paradigm down to belittle or altogether our contribution throughout civilization cannot possibly believe that black children can achieve at the same level as whites

.... It's about nothing happening, why I'm being administratively lynched. Palm Beach County School Superintendent Dr. Johnson euphemistically charged institutional resistance. I call it racism of the worst kind since the (inaudible) most of the victims are children.

Later in the 2002-2003 academic year, the District transferred Mr. Sherrod from Palm Beach

Lakes High to Suncoast High School in Riviera Beach where he taught social science.

On August 15, 2003, District Personnel Director James Hayes allegedly ordered Mr. Sherrod not to discuss his lawsuit outside the classroom, and shortly after assigned him to work as hall monitor at Glades Central High in Belle Glade. A few days later, Mr. Sherrod appeared at a school board meeting and petitioned the Board for an assignment closer to home. Although he requested placement at any one of five then open social studies positions within six miles of his home, the District instead assigned him to Roosevelt Full Service Center, an alternative education school located on Tamarind Avenue, West Palm Beach, offering alternative-to-suspension classes, vocational and other alternative education classes for grades 6 through 12.

During the summer of 2003 and early part of the 2003-2004 academic year, Mr. Sherrod continued to appear and speak at School Board meetings. For the most part, during this period he focused on his perception of the District's inattention to the significance of his litigation demands. His comments are excerpted, in pertinent part, as follows:

**July 16, 2003:**

[A]t this point in time there is [a suit] that is about ready for trial and another which is about ready for mediation. It seems that Board staff members think that I'm going to go away, that I'm going to quit or just disappear .... Now, this is not going away. In fact, the bill is going up. But I did my own legal work, I asked for one – for ten point five million dollars. When I got an attorney, she asked for fifteen. ... Your bill is going up and things are getting progressively worse... I'm not going anywhere....You need to send somebody to that meeting with some authority and don't let it be a venting session like it was the last time that I came down here.

**August 20, 2003:**

Do you know you hired between thirty and fifty social studies teachers this year and that a good portion of those aren't certified and that I've been certified for the past twenty years and am probably the only expert that knew African, African - American infusion program that the superintendent says that the teachers were not properly

6

Case 9:07-cv-80217-DTKH   Document 168   Entered on FLSD Docket 03/18/2010   Page 7 of 42

trained in?  This is my plan book.  Would you believe  I got marked down for not planning properly? ....  As yourself where this Board is headed in regard to litigation that we have.  Right now you have one suit which I've told you about.  You have another one on the  way and probably after today you got a third and a fourth. Possibly a fifth if I get killed on the way out to Belle Glade  because I go to sleep behind the wheel, because  I made my son promise me that he will sue you for wrongful death should I expire on the way.

**September 17, 2003:**

I guess you say he's back again.  Well, my (inaudible) get used to it.  I'll be here every month.  You will receive at least one letter per month from me until this mater is resolved.  Now, what I want to talk about tonight is the mediation that I went to 7/31. ... To put it bluntly, it was a joke.  They offered nothing.  In return  I was supposed to drop my fifteen  million dollar lawsuit and not file any more suits.  Ah, come on. ......First of all, they shouldn't have even brought up the fifteen million dollar suit because that wasn't even part of the mediation...Number two, you seem to still want to ignore this.  It's not going to go away....... I filed – I sent you a letter May 15, 2001. Okay.  I filed the first suit August 14, 2002.  And that's a little bit of a time differential in between them.  Your response was to ignore me.  It's not going to work. ..The only thing that's  going stop  it is my death.  Then my estate will pursue  it ...  Now, you can continue to ignore me and you will – well actually the taxpayers will continue to pay, okay, because it's going to run into some serious money before it's over with if you keep playing games.

On December 12, 2003,  the  District  transferred Mr. Sherrod  from Roosevelt Full Service Center to Roosevelt Middle School, where he was assigned to teach  seventh grade geography. Principal  Gloria Crutchfield  explained during her  testimony in *Sherrod I*  that Roosevelt Middle School was a Title I school, with a high concentration of academically and socially "needy" students. She testified  that she was initially impressed with Mr. Sherrod, finding him "very knowledgeable, very interesting and very verbal."  However, after the Thanksgiving holiday, she started getting complaints from parents about Mr. Sherrod's excessive work assignments and deviations from the curriculum.  In this same time frame, she noticed that Mr. Sherrod  had not turned in his grades.  On one specific occasion in mid-November, when she walked toward his "portable" [free standing

7

makeshift classrooms housed in trailer units outside main school building], she observed unsupervised students standing on the landing outside the classroom. She took the students into the room, where Mr. Sherrod explained that he had sent them out because of their disruptive behavior. She testified that leaving students unattended outside the classroom violated school policy.

Further, she testified that she noticed that the school mascot, the "Maroon Devil," hanging on the blackboard, instead of course material about Rome. She also noted a 10th grade curriculum binder on Mr. Sherrod's desk. She felt she had "seventh graders out of control" and scheduled a meeting with Mr. Sherrod to discuss her concerns and make clear that she "wanted to see him teaching geography for the 7th grade." She said Mr. Sherrod became very argumentative. Subsequently, Principal Crutchfield gave Mr. Sherrod an unsatisfactory performance evaluation, and on February 9, 2004, issued letter to Superintendent Johnson recommending his termination based on his failure to correct "performance deficiencies."

Notably, three days earlier, on February 6, 2004, Mr. Sherrod appeared on a local television news broadcast, taped on the premises of Roosevelt Middle School, in which he publicly discussed his pending retaliation suit against the School District.

Superintendent Arthur Johnson adopted Principal Crutchfield's recommendation and on February 25, 2004, advised Mr. Sherrod of his intent to recommend his discharge to the School Board at its April 21, 2004 Board meeting. On May 4, 2004, Superintendent Johnson filed a formal petition with the School Board seeking Mr. Sherrod's ouster. Following a public meeting on May 19, 2004, at which Mr. Sherrod appeared and was permitted to speak on his own behalf,[3] the School

---

[3] Mr. Sherrod concluded his comments at this hearing:

[L]ike the man said, I only became in conflict after they didn't like what I was

Board accepted Superintendent Johnson's recommendation and voted to terminate Mr. Sherrod's career contract.

Mr. Sherrod pursued an appeal with the Division of Administrative Hearings which appointed an Administrative Law Judge (ALJ) to review the School Board's decision. After hearing testimony and receiving other evidence, the ALJ entered a recommended order for discharge which the School Board adopted. Next, Mr. Sherrod appealed to Florida's Fourth District Court of Appeal, which, by opinion issued November 8, 2006, reversed the discharge order, finding that Fla. Stat. §1012.32(4(c) (2003)[4] required the School Board to base a decision to terminate primarily on student performance on annual tests. Because that was not done in Mr. Sherrod's case, it reversed and remanded the case to the School Board for further consistent proceedings. S*herrod v Palm Beach County School Board,* 963 So.2d 251 (Fla. 4th DCA 2006). [5]

In February 2006, Mr. Sherrod's § 1983 action ( *Sherrod I* ) went to trial in federal district

---

teaching. I had three meetings about which the substance of my class was a concern, not my performance. When they found out that Debbie Rains [phonetic] came in, evaluated me and said I was right on point, then all of a sudden I become stupid. Now, I predicted that this was going to happen 10/15/01. I told you I was going to be set up to be fired. Go ahead and do what you have to do and so will I. Thank you.

[DE# 153-6.].

[4] Section 1012.34(3), Fla. Stat.(2003) provides in pertinent part that "[t]he assessment procedure for instructional personnel ... must be primarily based on the performance of students assigned to their classrooms ... ". Further, the 2003 version of the statue applicable to Mr. Sherrod's evaluation further adds that an annual assessment "must primarily use data and indicators of improvement in student performance assessed annually as specified in s. 1008.22 and may consider results of peer reviews in evaluating the employee's performance." §1012.34(3)(a), Fla. Stat. (2003).

[5] On January 18, 2008, Mr. Sherrod and the School Board entered into a global settlement of all claims, with the one exception of the lawsuit then currently pending before the Eleventh Circuit Court of Appeals (*Sherrod II*), obviating need for further action on remand in the state case.

court with the Palm Beach County School District as the sole remaining defendant. The jury returned a special interrogatory verdict finding in favor of Mr. Sherrod on each element of his First Amendment retaliation claim. Upon motion of the School District, however, this court vacated and set the verdict aside, finding insufficient evidence to support *Monell* liability. The court ruled that plaintiff had failed to adduce evidence that "any member of the school board, much less a majority, agreed with the allegedly impermissible motive [of defendant Johnson]" for firing Sherrod," thereby defeating any possible ratification theory on which to sustain the District's liability for Johnson's conduct.

The Eleventh Circuit *sua sponte* dismissed Mr. Sherrod's appeal from that judgment as untimely, and denied his separately filed appeal from a post-judgment order denying motion for new trial on the basis of newly discovered evidence. *Sherrod v Palm Beach County School Dist.,* 237 Fed. Appx. 423 (11th Cir. 2007).

On March 8, 2007, Mr. Sherrod filed a second § 1983 suit ("*Sherrod II*") alleging (1) equal protection violations based on the School Board's failure to implement the infusion statute; (2) a First Amendment retaliation claim against the School Board and various individual teachers and administrators involved in the decision to transfer and terminate him; (3) due process violations based on Principal Crutchfield's alleged failure to formally observe his performance in classroom or allow him to complete his SAP before recommending termination, and defendant school board attorneys' alleged failure to alert him to an employment/address change of a former school district employee--Vice Principal Christine Hall (Olympic Heights) – before and during trial proceedings in *Sherrod I.*

After inviting plaintiff to show cause why *res judicata* principles did not preclude this second

wrongful discharge claim based on the same facts underlying *Sherrod I* [DE# 6], this court *sua sponte* dismissed the first amended complaint in *Sherrod II* with prejudice based on *res judicata* [DE# 31]. Mr. Sherrod appealed, and on April 7, 2008, the Eleventh Circuit Court of Appeals reversed and remanded the case for further proceedings explaining:

> The preclusion of claims that "could have been brought" does not include claims that arose after the original complaint was filed in the prior action, unless the plaintiff actually asserted the claim in an amended pleading, but *res judicata* does not bar the claim simply because the plaintiff elected not to amend his complaint. *Pleming v Universal-Rundle Corp.*, 142 F.3d 1354, 1357 (11th Cir. 1998). This is true even if the plaintiff discussed the facts supporting the subsequent claim in support of his claims in the prior case. Id. At 1358-59.

*Sherrod v School Board of Palm Beach County,* 272 Fed. Appx. 828 (11th Cir. 2008), citing *Pleming v Universal-Rundle Corp* 142 F.3d 1354, 1357 (11th Cir. 1998). [DE# 37]. Thus, the Eleventh Circuit concluded that the following claims, arising after October 24, 2003 ( the date on which plaintiff filed his last, third amended complaint in *Sherrod I* ) "could not have been brought in that action" and therefore survive *res judicata* application:

> (1) **Count 1** - equal protection claim (racial discrimination) against Defendant Neil St. John based on his alleged unequal and inferior teaching of Mr. Sherrod's daughter, Surya Sherrod (7th grade student at JFK Middle School in the Palm Beach County School District);[6]
>
> (2) **Count 2** -- first amendment retaliation claim against Defendant Crutchfield based on her February, 2004 recommendation to terminate Mr. Sherrod**;**
>
> (3) **Count 2** - due process/equal protection claim against all named defendants [Johnson, Giblin, Crutchfield, Carnes, Orloff, Pare-Evans, Lachance, Andrews, Collins, Hall, Hayes and Middleton) based on their failure to inform the district court and Mr. Sherrod during *Sherrod* I trial proceedings that Vice-Principal Christine Hall no longer worked for the School District at the time of trial, and by that time was herself involved in employment

---

[6] Plaintiff voluntarily dropped this claim against defendant St. John in subsequently amended pleadings, and it is therefore no longer at issue.

litigation against the School District ; [7]

(4) **Count 4** - first amendment retaliation claim against defendants Johnson and Crutchfield, "the underlying facts of which all occurred in 2004," and

(5) **Count 5** - procedural due process claim against defendants Superintendent Johnson,[8] Attorney Pare-Evans and Attorney Jean Marie Middletown, which arose during the course of *Sherrod I* or shortly thereafter.   [This claim charges that the District's trial attorneys deprived Mr. Sherrod of an opportunity to confront and question Vice-Principal Christine Hall at original trial proceeding in *Sherrod I;*  neglected to tell Mr. Sherrod or his attorneys that Vice Principal  Hall no longer worked for the District by  the time of trial; misled  Mr. Sherrod  and the court into believing that the District intended to call  Hall  as a witness during its case in chief.

Following  remand, this court ordered Mr. Sherrod, who by then was represented by counsel, to submit a second amended complaint which conformed  to the  window of claims surviving *res judicata* prescribed  by  the Eleventh Circuit. [DE# 59].  A second amended complaint [DE# 63] followed, which, upon motion of defendants, was  partially dismissed with  leave to file a third amended complaint [DE# 75].  A third amended complaint [DE# 80] followed, which, upon motion of defendants, was stricken for failure to comply with the pleading requirements of the court's prior order of dismissal and leave to amend, with leave to file a fourth amended complaint. [DE# 87].

Accordingly, on May 18, 2009, Mr. Sherrod filed his Fourth Amended Complaint,  reducing

---

[7]  This count derives from  ¶66 of  the amended complaint which recited, "When the 1st amendment case went to trial, knowing full well that Defendant Christine Hall no longer  worked for them and was also suing them for retaliation, the Defendants led Judge Hurley to believe that the author of the evaluation  that led to the plaintiff eventually being fired was going to testify."
    However, Mr. Sherrod  voluntarily dropped this claim in subsequently amended pleadings as to all defendants  except Evans Pare and Middleton, the attorneys representing the School District in *Sherrod I.*

[8]  Plaintiff voluntarily dropped this due process claim against Superintendent  Johnson in subsequently amended pleadings and it is therefore no longer at issue.

the  suit to the following three § 1983 claims:  (1) Fourteenth Amendment due process/equal protection violation against Principal Crutchfield and the School Board based on Principal Crutchfield's premature  recommendation to  terminate without  formal observation or allowing completion of Mr. Sherrod's SAP plan (Count 1);   (2)   First Amendment  claim against Superintendent Johnson, Principal Crutchfield and the School Board based  on allegation that  the defendants' decision to terminate him was in retaliation for  his "outward criticisms" of  the Palm Beach County School District's  inadequate  implementation of the  infusion statute (Count 2); and (3) a Fourteenth Amendment  procedural due process violation against the  School Board and Attorneys Vicki Evans-Pare and  Jean Marie Middleton  based  on the defendants' alleged suppression of the location of  a material witness before and during  trial of  *Sherrod I* (Count 3).

## II.  Summary Judgment Standard

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses.  *Celotex Corp. v Catrett*, 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986). Summary judgment is proper if  "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute about a material facts is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonnmoving party." *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91  L. Ed.2d 202 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment.  *Casey Enterprises, Inc. v  American Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981).  The substantive law identifies which facts are material.  *Anderson* at 248.

The party moving for summary judgment has the burden to show that there is no genuine

issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure all of the essential elements of the claim or defense." *Fontenot v Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). But, if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex*, at 323, 325. Once the movant has carried its burden, the nonmovant must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The nonmovant must adduce affirmative evidence. *See Anderson*, 477 U.S. at 257.

### III. Analysis

#### A. Count 1 - Defendants School Board & Crutchfield
#### (procedural due process/equal protection claims)

In Count 1, Mr. Sherrod alleges that Principal Crutchfield violated his due process rights by failing to formally observe him in the classroom prior to recommending his termination, and by then recommending his termination before he had opportunity to complete his remedial Site Assistance Plan (SAP), all in contravention of certain state law procedural rules and requirements. He also presses an equal protection claim against Principal Crutchfield, claiming that he was treated differently from other teachers laboring under site assistance plans who were given a full opportunity to complete remediation plans before initiation of termination proceedings. Mr. Sherrod alleges that the School Board had actual or constructive knowledge of Principal Crutchfield's illegal actions and motives on both counts, rendering it liable for the constitutional violations in question on a theory of ratification, deliberate indifference or delegation.

14

### a. procedural due process

The Due Process Clause of the Fourteenth Amendment requires "some kind of a hearing" prior to the discharge of a public employee who has a constitutionally protected property interest in his employment. *Cleveland Board of Education v Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed.2d 494 (1985). While necessary, the pre-termination hearing "need not be elaborate." *Id*. at 545. It is sufficient that a tenured public employee receive oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present reasons, either in person or in writing, why the proposed action should not be taken. *Id*. at 546.

In this case, the undisputed facts reveal that Mr. Sherrod received Principal Crutchfield's pre-termination notice of the intent to terminate and reasons for the proposed termination ( failure to correct performance deficiencies) on or about February 9, 2004, and that he later had an opportunity to be heard in his own defense before the School Board voted on her recommendation.

Mr. Sherrod attempts to raise a genuine issue of material fact on this claim by disputing whether the District complied with all of the State of Florida's procedures governing Site Assistance Plan administration. However, Mr. Sherrod's termination comported with constitutionally required minimal due process. Therefore, any allegation that the School Board failed to precisely follow more elaborate state procedures is immaterial. *See Riggins v Goodman*, 572 F.3d 1101, 1109 n. 3 (10th Cir. 2009), *citing Hicks v City of Watonga*, 942 F.2d 737 , 746 n. 4 (10th Cir. 1991)("A failure to comply with state or local procedural requirements does not necessarily constitute a denial of due process").

In short, while Mr. Sherrod's public employment (as a career contract teacher) is protected by the procedural component of the Due Process Clause, he received all the process that is due by

a pre-termination opportunity to respond, coupled with the post-termination administrative procedures provided by Florida Statutes.[9]  He thus adduces no evidence creating a genuine issue of material fact as to whether he was afforded adequate minimal procedural due process in the termination process.  Consequently, the defendants are entitled to summary judgment upon this claim.  *See e.g. Baker v Chandler*, 161 F. Supp.2d 1372 (S.D. Fla. 2001).

### b.  equal protection

As basis for his Equal Protection claim, Mr. Sherrod alleges disparate treatment in comparison to other similarly situated public school teachers on site assistance plans who were formally evaluated and permitted to complete their SAP prior to issuance of a recommendations affecting their employment.

The Equal Protection Clause of the Fourteenth Amendment requires that the government treat all similarly situated people alike. *City of Cleburne, Tex.  v Cleburne Living Center*, 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed.2d 313 (1985).  Strict scrutiny applies to the analysis of disparate treatment claims if plaintiff alleges he was treated differently because of membership in a suspect class or because he exercised a fundamental right.  *San Antonio Independent School District v Rodriguez*, 411 U.S. 1, 38-40, 93 S. Ct. 1278, 36 L. Ed.2d 16 (1973). Otherwise, the less rigorous

---

[9]  Notably, Mr. Sherrod prevailed in the post- termination review process, where the Fourth District Court of Appeal found insufficient evidence to support his termination consistent with the relevant statutory criteria and remanded the case to the agency for further consideration.

By successfully availing himself of post- termination review procedures provided by the State of Florida,  he necessarily received redress for any procedural due process violations that might have occurred in the pre-termination stage. *See Foxy Lady, Inc. v City of Atlanta, Ga.,* 347 F.3d 1232 (11th Cir. 2003), citing *McKinney v Pate*, 20 F.3d 1550, 1560 (11th Cir. 1994)(*en banc*)(since Florida courts possess power to remedy any deficiency in the process by which McKinney was terminated, McKinney cannot claim that he was deprived of procedural due process).

"rational relationship" standard  requires that plaintiff's treatment be  rationally related to a legitimate governmental interest.

In this case, Mr. Sherrod asserts a "class of one" equal protection claim, which requires him to prove that he was intentionally treated differently from other,  similarly situated public school teachers on SAP plans, and that there was no rational basis for the difference in treatment. *See e.g. Village  of Willowbrook v Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed.2d 1060  (2000).

Defendants argue that Mr. Sherrod   has offered no evidence on summary judgment to support his disparate treatment/equal protection claim.  The Court agrees.  Mr. Sherrod has not produced any evidence regarding similarly situated comparator teachers.  It is insufficient on summary judgment to simply  show that Principal Crutchfield had worked with other teachers on SAP plans before dealing with Mr. Sherrod. This statement does not support a  reasonable inference, as plaintiff urges, that Principal Crutchfield either consistently followed state procedures with the other teachers - suggesting disparate treatment of Mr. Sherrod -- or alternatively had a custom or practice of disregarding  state procedures governing ninety day SAP plans- suggesting uniform bad treatment of all teachers.   [Assuming *arguendo* the  latter proposition were true- or even available as an inference- it would in   any event tend to  *disprove* disparate treatment]. Thus, the court concludes that Mr. Sherrod  has not met  his burden of raising a genuine issue of material fact on his equal protection claim. Defendants are therefore entitled to summary judgment upon this claim.

## B.  Count 2 - - Defendants  School Board, Johnson, Crutchfield
### (First Amendment Retaliation)

In Count 2, Mr. Sherrod  alleges that Superintendent Johnson, Principal Crutchfield and the School Board violated  his First Amendment rights by terminating his employment in retaliation for

his "outspoken challenges" and "outward criticisms" questioning the District's failure to implement

a state statute requiring infusion of African and African-American studies into the District's high

school history curriculum.

In keeping with the Eleventh Circuit's prescriptions regarding the outer limits of the *res judicata* bar created by *Sherrod I,* Mr. Sherrod premises his retaliation claim in *Sherrod II* on the following events post-dating October 24, 2003, the date on which Mr. Sherrod filed his last, third amended complaint in *Sherrod I:*

  (1)    12-23-03 - Superintendent Johnson directs involuntary transfer of Sherrod from Roosevelt Full Service Center to Roosevelt Middle School, where he is placed under "watchful eye" of Principal Crutchfield;

  (2)    2-9-04 - Principal Crutchfield, working in coordination with Superintendent Johnson, recommends termination of Sherrod in alleged retaliation for his repeated public criticism of District's poor implementation of African and African American history infusion statute;

  (3)    2-19-04 - Superintendent Johnson, adopting recommendation of Principal Crutchfield, recommends termination of Sherrod to School Board;

  (3)    5-19-04 - Following public hearing at which Mr. Sherrod speaks on his own behalf, School Board accepts Superintendent Johnson's recommendation, suspends plaintiff without pay and terminates his employment.

### 1. Defendant School Board

In *Sherrod I*, the School District of Palm Beach County was the sole remaining defendant at the time the case went to trial. The School Board of Palm Beach County is the governing body of the School District of Palm Beach County.

In this case, Mr. Sherrod names the School Board of Palm Beach County as defendant. Both parties apparently view the School Board as the functional equivalent of the School District, and the

court accepts this equivalency for purposes of this discussion. [10]

In *Sherrod I,* the court entered final judgment in favor of the defendant School District on the same First Amendment retaliation claim asserted against the School Board in this action. *Res judicata* plainly attaches to the judgment in *Sherrod I,* [11] precluding Mr. Sherrod from re-litigating his First Amendment retaliation claim against the School Board in *Sherrod II.*

Notably, when the Eleventh Circuit outlined the remaining claims surviving *res judicata* application in its earlier issued opinion in *Sherrod II,* the surviving First Amendment retaliation

---

[10]        Within each school district, the Florida Legislature has assigned specific duties to certain positions: (1) school boards "shall operate, control and supervise" the public schools in their district and may exercise any power except those prohibited by the constitution or general law; and (2) the superintendent is charged with "the administration and management of the schools and for the supervision of instruction in the district." § 1001.32(2)-(3), Fla. Stat. (2006).

The general powers and duties of district schools boards are set forth in §§ 100.41 and 1001.42, Fla. Stat. (2006). These include the powers to determine policies and programs for the efficient operation and general improvements of the district school system, and to adopt rules, to prescribe standards and policies to provide each student the opportunity to receive a complete education program.

The school board is empowered to contract, sue and be sued, and is the exclusive contracting agent for the district school system. § 1001.41(4), Fla. Stat. (2006).

The district school superintendent is the secretary and executive officer of the district school board, and as such is responsible for the administration and management of schools and for the supervision of instruction in the school district. §§ 1001.23(3), 1001.33, 1001.48, Fla. Stat. (2006). The general duties of the district school superintendent include the duty to advise, counsel and recommend to the district school board on all educational matters and to recommend action on such matters to the district school board. Section 1000.49(4), Fla. Stat. (2006).

[11]  Even though Mr. Sherrod did not formally amend his operative third amended complaint in *Sherrod I* to allege unlawful retaliation based on actual termination (as opposed to transfer/demotion occurrences forming the predicate of his initial complaint), when the case went to trial in February, 2006, the actual termination charge emanating from his May, 2004 discharge was presented to the jury as the premise of his retaliation claim, and the judgment ultimately entered in that action was based on that claim. By voicing no objection to the actual discharge evidence, and corresponding expansion of Mr. Sherrod's retaliation claim in *Sherrod I,* the School District effectively acquiesced to an amendment of the pleadings to conform to the evidence presented on the "actual termination" retaliation claim.

claim only included claims against Superintendent Johnson and Principal Crutchfield, and only to the extent those claims derived from events post-dating October 24, 2003, the date of the last amended complaint field in *Sherrod I.*

Accordingly, the First Amendment retaliation claim lodged against the School Board in this action – identical to the First Amendment 'actual termination' retaliation claim tried against the School District in *Sherrod I* – is now dismissed with prejudice based on *res judicata*.

### 2. Defendants Crutchfield & Johnson

Because Superintendent Johnson and Principal Crutchfield were not named as party defendants when *Sherrod I* went to trial, their individual liability -- although deriving from the same acts on which the School Board's liability was tried in *Sherrod I* -- survives *res judicata* application, as determined by the Eleventh Circuit. Accordingly, the court is now required to assess the sufficiency of plaintiff's *prima facie* case on this retaliation claim as to each of these defendants.

A public employee asserting a First Amendment retaliation claim must show, by a preponderance of the evidence, that: (1) the employee's speech was constitutionally protected; (2) the employee's First Amendment interest in engaging in the speech outweighs the employer's interest in prohibiting the speech to promote the efficiency of the public services it performs through its employees, and (3) the speech played a "substantial part" in the employer's decision to demote or discharge the employee. *Brochu v City of Riviera Beach*, 304 F.3d 1144 (11th Cir. 2002); *Anderson v Burke County, Ga.*, 239 F.3d 1216 (11th Cir. 2001). However, even where these elements are established, the defendant may still prevail if it demonstrates by a preponderance of the evidence that "it would have reached the same decision ... even in the absence of the protected conduct." *Id*. at 1219.

The first two elements are questions of law designed to determine whether the First Amendment protects the employee's speech. The third element and affirmative defense are questions of fact designed to determine whether the adverse employment action was taken in retaliation for the protected speech. *Battle v Board of Regents for Georgia,* 468 F.3d 755 (11th Cir. 2006).

### a. Protected Speech

In *Sherrod I,* this court ruled that Mr. Sherrod's speech about the infusion statute was entitled to First Amendment protection as touching upon a matter of public importance. Three months after conclusion of trial proceedings in *Sherrod I,* the United States Supreme Court issued its decision in *Garcetti v Ceballos*, 547 U.S. 410 (2006). Since this court's ruling in *Sherrod I* pre-dated *Garcetti,* the court did not have occasion or opportunity to apply the two step approach to determining "protected speech" outlined in that decision. Thus, today the court must reevaluate Mr. Sherrod's speech under the two-step analysis outlined in *Garcetti.*

In determining the threshold issue of whether a public employee has engaged in speech entitled to constitutional protection, the court first asks "whether the employee spoke as a citizen on a matter of public concern." *Battle,* citing *Garcetti v Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 1958, 164 L. Ed.2d 689 (2006). If the answer is "no," the employee's speech is not entitled to First Amendment protection. *Id,* citing *Garcetti* at 1958. If the answer is "yes," "[t]he question becomes whether the whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti* at 418, citing *Pickering v Board of Education*, 391 U.S. 563 (1968) and *Connick v Myers*, 461 U.S. 138(1983).

In *Abdur-Rahman v Walker*, 567 F.3d 1278 (11th Cir. 2009), the Eleventh Circuit discussed the rationale behind the requirement that a public employee speak "as a citizen" to receive

constitutional protection for his speech:

> First, because "government offices could not function if every employment decision became a constitutional matter," *Connick v Myers*, 461 U.S. 138 (1983), "[Supreme Court] precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job." *Garcetti,* 547 at 426 [citations omitted] ..... Second, "[g]overnment employers, like private employers, need a significant degree of control over their employee's words and actions; without it, there would be little chance of the efficient provision of public services," *Id* at 418, 126 S. Ct. at 1958. Because of the unique trusted position that public employees occupy, they ought not to receive constitutional protection for speech that "express[es] views that contravene governmental policies or impair[s] the proper performance of governmental functions." *Id* at 419, 126 S. Ct. at 1958. Third, when complaints under the First Amendment are limited to instances in which a public employee proves that he "spoke as a citizen on a matter of public concern," *Battle*, 468 F.3d at 760, courts avoid "judicial oversight" of workplace communications and "permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers."*Garcetti*,547 U.S. at 423, 126 S. Ct. at 1961.

In *Garcetti,* the Supreme Court considered whether a memorandum written by a deputy district attorney about misrepresentations contained in an affidavit used by police to obtain a search warrant was protected by the First Amendment. When a defense attorney told the assistant district attorney that he found inaccuracies in an affidavit supporting a search warrant, the assistant investigated and concurred. The assistant district attorney then communicated his concerns to his supervisors in a memorandum suggesting that the district attorney's office refrain from prosecuting the crime. His supervisors disagreed and proceeded with the prosecution. Thereafter, the assistant district attorney was reassigned, transferred to another location and denied a promotion. The assistant sued, claiming these actions were taken in retaliation against him for having engaged in First Amendment protected free speech.

Ultimately, the Supreme Court ruled that the assistant's memorandum was not protected speech because the statements were made pursuant to his job duties of advising his supervisors

about  how best to proceed with a pending case. The court noted  that  the assistant  wrote his memorandum  because  "that is part of what he, as a ... deputy, was employed to do."  Thus, it held that the assistant district attorney  was not speaking as a citizen, and consequently,  the Constitution did not insulate his communication from employer discipline.  *Id.* at 421-22.

In  response to a concern expressed by Justice Souter in his dissenting opinion regarding the impact of the majority's holding on  teachings of "public university  professors" and academic freedoms found in "public colleges and universities," the majority qualified its holding, adding the following caveat:

> Justice Souter suggests today's decision may have important ramifications  for academic freedom at least as a constitutional  value... There is some argument  that expressions related to *academic scholarship or classroom instruction* implicates additional constitutional interests  that are not fully accounted for by this Court's customary employee  speech jurisprudence.  We need not, and for that reason do not, decide whether the analysis we conduct today would apply in the same manner to a case involving speech related to *scholarship or teaching*.

*Id* at 425. (Emphasis added).  Mr. Sherrod invokes  this caveat in his opposition to the defendants' pending summary judgment motions, urging that *Garcetti*'s  two-step analysis  of public employee "protected speech," with  its initial  focus on whether speech is made "as a citizen" is *not* appropriately applied  to speech by  a public high school teacher in the first instance because such a case implicates the First Amendment concerns attendant  to "academic freedom" carved out by the majority in  *Garcetti.*   Thus, eschewing application of *Garcetti,* Mr. Sherrod contends  that the traditional  *Pickering* balancing test  controls the analysis of his First Amendment retaliation claim.

This view, however, is erroneous as it misapprehends  the sweep of the *Garcetti*  "academic freedom" caveat. While *Garcetti* did  leave open the question of whether the "as a citizen" requirement is appropriately pressed  in determining the protected status of  curricular  speech (i.e.

instruction,  classroom  speech or academic scholarship)  at the public university or college level, [12]

this issue is not presented in the case at bar because the speech at issue was indisputably made *outside*

the classroom, and in no way involves  academic scholarship.

Mr. Sherrod  is  quite  specific  in  his  contention  that  he  was  involuntarily  transferred  to

Roosevelt  Middle  School  in  December, 2003  and  placed  on  an  "ill advised"  SAP, "under the

watchful eye"  and  direction of Principal Crutchfield,  all because of his "outward criticisms" of the

School District.  He also contends that his ultimate suspension and termination on May 19, 2004 was

"in retaliation for his outward criticisms."  [Fourth Amended Complaint, p. 19, ¶6].   Further, in

describing the post- October 24, 2003 events on which his current retaliation claim is predicated, he

contends that Principal Crutchfield and Superintendent Johnson coordinated their actions to retaliate

against him for his  prior  "outward" – i.e. extra-curricular --speech critical of the District's infusion

efforts and the  retaliatory treatment he allegedly suffered in consequence of that speech..

In short,  this is not a case about a teacher disciplined for the content of his classroom

teachings or his academic writings; as framed by Mr. Sherrod,  it  is a case about a  public school

teacher  disciplined  as  a  means  to "humiliate and punish"  him  for publicly criticizing school

administrators in a public forum *outside the classroom*.[13]

---

[12]  Post-*Garcetti*, the few circuit courts of appeal addressing this issue have reached opposite results. Compare *Mayer v Monroe County Community School Corporation,*  474 F.3d 477 (7th Cir.), *cert. den*., 552 U.S. 823 (2007)(*Garcetti* applies in context of classroom speech of K-12 public school teachers) with *Lee v York County School Division,*  484  F.3d 687 (4th Cir. ), *cert. den*., 552 U.S. 950 (2007)(continuing to apply traditional *Pickering-Connick* approach, as  Supreme Court did not "explicitly ... decide whether [the *Garcetti*] analysis would apply in the same manner to a case involving  speech related to teaching").

[13]  In *Sherrod I,* plaintiff initially alleged that Principal Fran Giblin instigated a negative performance evaluation  to intentionally trigger and structure a SAP plan doomed to failure as a

*Garcetti* plainly applies to determine, as a threshold matter, the protected status of Mr. Sherrod's controversial speech in this action. *Cf.   D'Angelo v School Bd of Polk County, Florida*, 497 F.3d 1203 (11th Cir. 2007) (statements made by a public high school principal in connection with his efforts to convert school to charter status subjected to *Garcetti* analysis; although principal was not expressly assigned to pursue charter conversion, he admitted he acted to fulfill his professional duties and thus acted outside scope of First Amendment).   *Garcetti* teaches that the inquiry into whether a public employee spoke "as a citizen" or "pursuant to his official duties" is "a practical one," where formal job descriptions do not control because they may "bear little resemblance to the duties an employee actually is expected to perform," and because employers may craft broad descriptions in effort to restrict the First Amendment rights of employees. *Id* at 424-25.

In *Garcetti*, the practical inquiry was straightforward because the assistant district attorney admitted he wrote the controversial memorandum as part of his job duties. A prosecutor is hired to assess search warrants and write recommendations on when and how to exercise prosecutorial discretion. Thus, when the assistant expressed his opinion about the pending case in a memo to his superior, he did exactly what he was hired to do. The fact that his memo incidentally involved contentious matters of public concern, such as police officers' veracity and prosecutorial misconduct,

---

means of retaliating against and ousting Mr. Sherrod for persisting in "overly" infusing his world history class curriculum with African and African-American history content.

While this allegation is directed at curricular speech, the conduct of Fran Giblin is not a predicate for the First Amendment retaliation claim lodged in this action, nor could it be as the activity of Principal Giblin in question allegedly occurred during the 2001-2002 academic year, well before the date of Sherrod's last amended pleading in *Sherrod I* (October 24, 2003). By the time *Sherrod I* went to trial, Principal Giblin, originally named as party defendant, had been voluntarily dropped. Because the predicate retaliatory acts attributed to him all occurred before October 24, 2003, *res judicata* bars any effort to re-plead such claim against Principal Giblin now, eliminating any need to examine the applicability of the *Garcetti* caveat to this segment of plaintiff's speech.

was  irrelevant to the threshold constitutional inquiry into the protected status of his speech.

In this case, Mr. Sherrod's publicly-aired complaints about the inadequacy of the District's implementation of the African and African-American history  infusion statute touched on Mr. Sherrod's own job responsibilities in the sense that his complaints dealt with the subject matter on which he taught, and impediments to his teaching performance created by the District's perceived shortcomings.   On the other hand, plaintiff's duties as a public high school world history teacher did not include an obligation to develop the curriculum or ensure district-wide compliance with the infusion  statute.  Therefore, the court holds that Mr. Sherrod's statements at school board meetings about his perception of the inadequacy of the District's implementation of the infusion statute should be classified  as speech made "by a citizen":   His statements primarily  centered on  how the District's shortcomings impeded the proper performance by all teachers under its employ and the collateral damage to all students entrusted  to their tutelage.  Moreover, the context and content of his speech demonstrate that he was complaining, in larger  part,  as a citizen  seeking to advance the education of all students in the District,  particularly African- American students,  whom he believed particularly benefitted, both academically and socially, from  the tutelage of  educators  well-versed in  African and African-American history.[14]

There is no evidence that Mr. Sherrod had a  duty, by contract or otherwise, to take up this cause.  Although speech which  closely *relates* to an employee's job functions may be considered speech made pursuant to his official duties,  even if it is not formally required,  *see  Williams  v*

_____

[14]  The court recognizes that many of the school board presentations focused on the progress of Mr. Sherrod's own lawsuit,  his perception of the District's dismissive attitude toward his suit, and the District's perceived  inattention to settlement opportunities.  These complaints are certainly personal to Mr. Sherrod and the court does not convey, by its ruling today, that these matters fall within the penumbra of protected speech identified in the body of this order.

*Dallas Independent  School District*, 480 F.3d 689 (5th Cir. 2007); *Gentilello v Rege*, 2008 WL

2627685 (N.D. Tex. 2008); *Dorcely v Wyandanch  Union Free School Dist*, 665  F. Supp. 2d 178

(E.D.N.Y. 2009)(teacher and school psychologist complaining about lack of sufficient education and

instructional resources and appropriateness of counseling curriculum spoke pursuant to official duties

and not as citizen),  in  this case it is apparent that  Mr. Sherrod acted independently, as a citizen in

his own right, in expressing  dismay over  the larger societal cost attendant to the perceived failure

of the District to fully and consistently  implement the African and African-American history infusion

statute on a district- wide basis.

Thus, the court rules, as a matter of law, that  Mr. Sherrod  acted  "as a citizen" in making the

controversial speech at issue in this action. [15] The court also finds that questions pertaining to the

efficient  implementation  of  Florida's  African  and  African-American  history  infusion  statute  are

matters of public concern.  The fact that the Florida legislature has chosen to speak on this specific

question of  public school history curriculum content evinces the public importance of the subject

---

[15]  Compare *Abdur-Rahman v Walker*, 567 F.3d 1278 (11th Cir. 2009) (compliance inspectors
for public works department who complained to supervisors  about improper  reporting of sewer
overflows to state authorities and over flow related violations of environmental laws spoke pursuant
to job duties and not as citizens);  *D'Angelo v  School Board of Polk County, Florida*,  487 F.3d
1203 (11th Cir. 2007)(statements  made by principal  in connection with effort to convert  school to
charter status  were made pursuant to his official duties as principal and  hence not protected by First
Amendment);  *Williams v Dallas Independent  School Dist*, 480 F.3d 689 (5th Cir. 2007)(coach's
speech questioning  handling  of school athletic funds was made in course of  performing  his
employment, rather than as a citizen and thus not protected by First Amendment); *Houlihan v Sussex
Technical School Dist.*, 461 F. Supp. 2d  252 (D. Del. 2006)(school psychologist's statements
concerning school's alleged noncompliance with Individuals with Disabilities Education Act were
made in connection with her official duties as school psychologist and  therefore lay outside First
Amendment protection);  *Woodlock v Orange Ulster B.O.C.E.S.*, 281 Fed. Appx. 66 (2d Cir.
2008)(special education school counselor's communications  regarding lack of physical  education
and art classes at satellite facility concerned tasks she was paid to perform, and thus were not
protected speech for purposes of First Amendment retaliation claim).

matter; the fact that Mr. Sherrod took issue with the District's compliance with that law undoubtably touches on a matter of public concern. Indeed, the District's compliance efforts were initially called into question by a news article in The Palm Beach Post newspaper.

With these twin findings, the court concludes that plaintiff's comments constitute protected speech under the First Amendment. Next, following the second step of the Garcetti analysis, the court looks to whether the defendants had adequate justification for treating Mr. Sherrod differently from any other member of the general public, i.e. whether the employer's interest in prohibiting the speech to promote the efficiency of public services it performs outweighs the employee's interest in engaging in the speech. In balancing the State's interest in efficient provision of public services against the employee's speech interest, the court considers several factors, including: (1) whether the speech at issue impedes the government's ability to perform its duties efficiently; (2) the manner, time and place of the speech, and (3) the context within which the speech was made. *Morales v Stierheim*, 848 F.2d 1145, 1149 (11th Cir. 1988), *cert. den.*, 489 U.S. 1013 (1989).

Here, Mr. Sherrod's remarks at public school board meetings spoke to the overdue attention and emphasis he felt the District should place on infusing African and African- American history into the district wide world history curriculum, as required by state statute. Mr. Sherrod also persistently complained that he felt mistreated and unfairly singled out for review and adverse employment action when he raised his concerns about implementation of the statute, after which he was transferred to various remote locations, assigned demeaning work (hall monitor) and placed on a SAP plan intentionally designed to doom, until he was ultimately assigned to teaching 7th grade geography at Roosevelt Middle School, culminating in adverse evaluation and recommendation for termination by Principal Crutchfield.

The record contains no evidence that Mr. Sherrod's remarks generated racial disharmony at any of the schools in which he taught or otherwise disrupted the efficient functioning of the School District. The evidence suggests that Mr. Sherrod advocated, in a noninflammatory manner, a fuller and more consistent implementation of the Florida African and African-American history infusion statute.

In addition, during the period in question, Mr. Sherrod spoke as the parent of a son and daughter attending a public high school and middle school. Indeed, the school board meetings at which he spoke are intended to allow teachers, administrators and parents to air issues of concern. Mr. Sherrod, like any other citizen, has a strong interest in expressing his thoughts on issues of public concern free from government sanction.

On this record, the court concludes that Mr. Sherrod's interest in free speech outweighed the District's interest in the efficient delivery of its services. In similar circumstances, the Eleventh circuit has concluded that a public school employee (teacher aide)'s interest in free speech outweighed her employer's interest in preserving the efficiency of public services that it performs through its employees. *Belyeu v Coosa County Board of Education*, 998 F.2d 925 (11th Cir. 1993)(free speech interests of teacher aide's who questioned school administrators' failure to have commemoration for Black History month outweighed school system's interest in reducing racial animosity and avoiding racially divisive public criticism). As in *Belyeu*, the *Pickering* balancing favors Mr. Sherrod's speech before the School Board of the School District of Palm Beach County.

### b. Causation

Where, as here, an allegedly biased recommender and actual decision maker are not the same person, to establish the causation element of a *prima facie* retaliation claim plaintiff must prove:

(1)  protected speech played a "substantial part" in the defendant's decision to recommend his termination, and (2) the discriminatory animus behind the recommendation – and not the underlying employee misconduct identified in the recommendation – was the actual or "direct" cause of the final decision  to terminate.  *Stimpson v City of Tuscaloosa*, 186 F.3d 1328 (11th Cir. 1999).

The "cat's paw" theory is one way to establish this critical link.   A plaintiff pursuing this theory must prove that the decision-maker followed a biased recommendation without independently investigating the complaint against the employee.  *Id*., citing *Llampallas v Mini-Circuits Lab, Inc*., 163 F.3d 1236, 1248 -49  (11th Cir. 1998).  Put another way, a *prima facie* case of retaliation  under a cat's paw theory of causation requires proof of the  lack of an  independent investigation into the formal charges against the employee.

As applied to this case, application of a  cat's paw theory of causation requires  Mr. Sherrod to prove, as part of his *prima facie* case, that:  (1)  his protected speech played a "substantial part" in Superintendent  Johnson and/or Principal Crutchfield's decision to recommend his discharge, and (2)  the School Board did not independently investigate the alleged performance deficiencies identified in the defendants' recommendation. Because plaintiff  bears the burden of proof on the essential element of causation, on summary judgment, the defendants, as movants,  may discharge their burden of proof by showing there is an absence of evidence on causation.  *Celotex*, 477 U.S. at 323, 325; *Byers v Dallas Morning News, Inc*., 209 F.3d 419, 424 (5th Cir. 2000).

Principal Crutchfield purports to do so,  contending that there is no proof that Mr. Sherrod's speech was a "substantial  motiving factor" in her  recommendation for his discharge, and that the evidence instead shows that her decision was solely linked to uncorrected "performance deficiencies which  spanned  more  than  two  school  years."  However,   the  evidence  shows  that  Principal

Crutchfield's recommendation was made just three days after Mr. Sherrod appeared on a local television news program, taped on school premises, discussing his then pending lawsuit against the District and reiterating his complaints about the District's alleged retaliatory mistreatment of him. This close temporal link between Mr. Sherrod's protected activity and Principal Crutchfield's recommendation, which constituted the first step toward an adverse employment action, is sufficient to create an inference of causation. Thus, the court finds sufficient record evidence to establish a genuine issue of material fact pertaining to Principal Crutchfield's motivation in making the recommendation to terminate, and therefore shall deny her motion for summary judgment on this element of the claim.

Superintendent Johnson similarly asserts in general conclusory terms that "there is no evidence that plaintiff's speech played may role in Defendant's Johnson's recommendation for termination," and that he instead based his recommendation on Principal Crutchfield's recommendation, Mr. Sherrod's poor evaluations, "as well as information received from the Department of Professional Standards and other school administrators, individuals, and employees." However, the record contains some evidence, from Mr. Sherrod's testimony, that Superintendent Johnson once admonished Mr. Sherrod for persisting in his school board appearances and specifically told him to stop showing up and airing his complaints. In addition, the record contains affidavit of Marcia Andrews, former Chief Personnel Officer for the Palm Beach County School District between 2000-2003, who avers that she worked with Superintendent Johnson for "many years," and through that experience learned:

> If he has an employee who is not a 'team player,' i.e. someone who asks questions or takes an unpopular stance, it has been his practice to retaliate against that employee by taking whatever steps necessary by moving them to other positions, demoting

them, to keep them quiet. He usually uses others to do his underhanded work.

[Andrews Affidavit, DE# 104, ¶ 18] .

This evidence is sufficient to create an inference that Superintendent Johnson's actions may have been motivated by a desire to quell Mr. Sherrod's persistent criticisms of his administration, with particular desire to silence Mr. Sherrod's constant complaints about the District's allegedly inferior infusion efforts, an issue which had already been the subject of negative local press attention. Thus, the court finds sufficient record evidence to establish a genuine issue of material fact pertaining to Superintendent Johnson's motivation in recommending plaintiff's discharge, and therefore shall deny Defendant Johnson's motion for summary judgment on this element of the claim.

The existence of a fact issue on the motivating animus behind Superintendent Johnson and Principal Crutchfield's recommendation to terminate does not end the inquiry on causation, however, because neither defendant had the power to terminate Mr. Sherrod. Rather, the record evidence conclusively demonstrates that the School Board held the exclusive power to do so. Consequently, Principal Crutchfield and Superintendent Johnson's recommendation that the Board terminate Mr. Sherrod does not, itself, constitute a change in the terms of conditions of employment sufficient to establish a *prima facie* retaliation case, absent evidence of a sufficient causal link between Mr. Sherrod's ultimate termination by the School Board and the discriminatory animus behind the defendants' recommendations.

Although neither Principal Crutchfield nor Superintendent Johnson challenges the sufficiency of evidence on this strand of the causation link within the context of these summary judgment proceedings, because the viability of Mr. Sherrod's retaliation claim ultimately hinges on this critical

element, the court shall take the opportunity to review the record evidence on the issue within the appropriate analytical paradigm in order to facilitate the parties' orderly presentation of evidence at trial and to streamline the issues remaining for determination at trial.

In addressing the potential *Monell* liability of the defendant School Board  – an issue which the court ultimately does not  reach in its decision here  because the claim against the School Board is  dismissed on  *res judicata* grounds discussed *supra* – this discussion generates  reference to some evidence bearing some relation to  issues attendant to  invocation of "cat's paw" causation theory.

Although  Mr. Sherrod  acknowledges that the School Board performed its own  investigation of the incompetency charges against him through the District of Office Professional Standards, he takes great issue with the objectivity, adequacy and independence of that investigation.  For example, he submits the affidavit of  Marcia Andrews, former Chief Personnel Office of the Palm Beach County School District, who avers she stood  "over" the Department of Professional Standards and was personally  responsible for oversight of Mr. Sherrod's school transfers and  placements. [DE# 104, ¶ 2,3].  Ms. Andrews avers that she came to know Mr. Sherrod through his many appearances at Board meetings where he consistently complained about the District's African/African-American history infusion policy and aired  his perception that District personnel were mistreating  him because of his complaints.

In addition, the record  reveals that none of  Mr. Sherrod's student performance data (test scores) were part of  the professional standards  file before  the School Board when  it voted to terminate his contract, a deficiency that prompted  Florida's Fourth District Court of Appeal to vacate the discharge decision and  remand the case for  further  proceedings designed to take that  data into account.  *Sherrod v Palm Beach County School Board*,  963 So.2d  251 (Fla. 4th DCA 2006).

This alleged lapse in the Department of Professional Standards' investigation into the employee competency issue identified in the recommendations, viewed in conjunction with Ms. Andrews' testimony regarding Superintendent Johnson's alleged historical practice of silencing critics through undesirable transfers and demotions, while "us[ing] others to do his underhanded work," operate to join a fact issue as to whether the incompetency charge leveled against Mr. Sherrod was independently investigated and relied upon by the School Board in making its final decision to terminate, such that the School Board acted pursuant to its own independent investigation when it terminated Mr. Sherrod, or whether it instead acted as a mere conduit or "cat's paw" for Superintendent Johnson or Principal Crutchfield's allegedly biased recommendations. *Compare Dwyer v Ethan Allen Retail, Inc*., 325 Fed. Appx. 755 (11th Cir. 2009)(unpub)(no *prima facie* case of retaliatory termination where record evidence showed ultimate decision maker independently investigated employee's conduct and came to own conclusion that a policy violation had occurred); *Stimpson v City of Tuscaloosa, supra* (insufficient evidence to establish causal link where civil service board having sole power and discretion to terminate police officers conducted a three day hearing to investigate charges).

On this same evidentiary predicate, the court finds genuine issues of material fact on the issue of whether the defendants' proffered reasons for recommending Mr. Sherrod's termination were pretextual.

Thus finding that defendants' have not met their burden of disproving the element of causation, their motions for summary judgment based on lack of animus evidence shall be denied. The inquiry now turns to the final issue posed by the parties' competing summary judgment motions on the First Amendment retaliation claim, *viz*, whether Superintendent Johnson and Principal

34

Crutchfield are entitled to qualified immunity for their actions.

### c. Qualified Immunity

Qualified immunity operates to ensure that "before they are subjected to suit, [public] officers are on notice their conduct is unlawful." *Hope v Pelzer*, 536 U.S. 730, 122 S. Ct. 2508 (2002), citing *Saucier v Katz*, 533 U.S. 206, 121 S. Ct. 2151 (2001). Thus, qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 739, citing *Harlow v Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed.2d 396 (1982).

For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*, citing *Anderson v Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed.2d 523 (1987). Thus, in light of the *Anderson* definition of "clearly established," the question "whether the .. right was clearly established at the time the defendant acted ... requires an assessment of whether the official's conduct would have been objectively reasonable at the time of the incident." *Conroe Creosoting Co. v Montgomery County, Tex.,* 249 F.3d 337, 340 (5th Cir. 2001).

This does not mean that the official's conduct is entitled to protection unless it is shown that "the very action in question has previously been held unlawful." *Anderson* at 640. Rather, the central concept is that of "fair warning." The law can be clearly established "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope*, 536 U.S. at 740, 122 S. Ct. 2508.

35

The court has already determined that the challenged conduct of Superintendent Johnson and Principal Crutchfield, viewed in the light most favorable to the plaintiff, could support a finding of retaliatory motive which would amount to a violation of federal law, and that the record facts give rise to a debatable issue of fact on causation under a "cat's paw" theory. Since the plaintiff has thus asserted and demonstrated sufficient facts to create a jury issue on whether the defendants violated his rights under the First Amendment, it is appropriate for the court to now examine whether the constitutional right asserted by plaintiff was "clearly established" at the time the defendants acted. *See generally Siegert v Gilley*, 500 U.S.226, 111 S. Ct. 1789, 114 L. Ed. 2d 277 (1991).[16]

Here, the court concludes that Superintendent Johnson and Principal Crutchfield had fair notice that the termination of a public school teacher for publicly calling the School Board to task for allegedly violating a state law requiring African and African-American history infusion into the District's world history curriculum was unconstitutional. *Garcetti v Ceballos*, 126 S. Ct. 1951 (2006), does not make Mr. Sherrod's rights as of 2004 any less clearly established. In 2004, the Eleventh Circuit plainly recognized that the First Amendment protected public employees for speaking out on matters of public concern, [17] that the recognition and teaching of African and African-American history in public schools touched on a matter of public concern, *Belyeu v Coosa*

_____

[16] In resolving questions of qualified immunity, the court is required to resolve the threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the state official's conduct violated a constitutional right? *Scott v Harris*, 550 U.S. 372, 377, 127 S. Ct. 1769, 167 L. Ed.2d 686 (2007). In the summary judgment posture, this usually means adopting the plaintiff's version of the facts, *id.* at 378, as the court does here.

[17] *See e.g. Leonard v City of Columbus*, 705 F.2d 1299 (11th Cir. 1983) (black police officers protesting police brutality to members of black community as well as discrimination within the department against black officers addressed matter of public interest entitled to protection against retaliation under first amendment), cert. den. 468 U.S. 1204 (1084).

*County Board of Education*, 998 F.2d 925 (11th Cir. 1993),  and that the First Amendment generally protected  whistle blowers against retaliation. [18]

Recognizing that the existence of  "protected speech" for a  public employee  further hinges on   "the sensitive *ad  hoc* balancing that *Pickering* entails," *see Brewster v Board of Education of Lynwood Unified School Dist.,* 149 F.3d 971, 980 (9th Cir. 1998), cert den., 526 U.S. 1018 (1999), the court must also consider whether, under the governing law in 2004, a reasonable jury could find that "the outcome of the *Pickering* balance so clearly favored ... [plaintiff] that it would have been patently unreasonable for the school officials to conclude that the First Amendment did not protect [plaintiff's] speech." *Settlegoode  v Portland Public Schools* ,  371 F.3d 503 (9th Cir. 2004), citing *Brewster* at 980.

Based on the record evidence, a  jury in this case could reasonably find that the interests served by allowing Mr. Sherrod to express himself outweighed any  minor workplace disruption which may have resulted  from his speech.  As it is "well settled that a teacher's public employment cannot be conditioned on [his] refraining from speaking out on school matters," it would have been patently unreasonable for  Johnson and Crutchfield to conclude that Mr. Sherrod's speech was not protected.  *Settlegoode v Portland Public Schools*, citing *Pickering,* 391 U.S. at 572, 88 S. Ct. 1731.  Johnson and Crutchfield are therefore not entitled to qualified immunity  from Mr. Sherrod's §1983 claim.  *See e.g. Settlegood v Portland Public Schools, supra* (school officials not entitled to qualified

---

[18]   *See e.g.Walker v Schwalbe*, 112 F.3d 1127 (11th Cir. 1997)(clearly established law informed reasonable government officials in 1991 that public employee could not be punished for his First Amendment  speech, noting "core concern of First Amendment  is protection of whistle blower attempting to expose government corruption"), citing *Bryson v Waycross*, 888 F.2d 1562 (11th Cir. 1989), cert. den., 523 U.S. 1117 (1998)

immunity, where probationary special education teacher alleged retaliatory non-renewal of contract in response to teacher's allegations of violations of law in school district's special education program); *Love-Lane v Martin*, 355 F.3d 766 (4th Cir.)(reasonable superintendent would be aware of teacher's right to speak out in opposition to race discrimination against elementary school children, and would know that retaliation in response to such speech is a First Amendment violation, especially where speech was not disruptive to point of jeopardizing welfare of the children), cert. den., 543 U.S. 813 (2004).

While *Garcetti* changes the requisite analysis of "protected speech," such that Johnson and Crutchfield, if they acted today, might persuasively argue that Mr. Sherrod's rights are not currently "clearly established, the law has not changed enough to deprive Mr. Sherrod of First Amendment protection. The general touchstone for determining qualified immunity is still fair notice, *Hope v Pelzer, supra* 536 U.S. at 741; *Schwenk v Hartford*, 204 F.3d 1187 (1196 (9th Cir. 2000), which is measured according to standards in existence at the time of the challenged actions. *Harlow*, 457 U.S. at 818; accord *Siegert v Gilley*, 500 U.S. 226, 231 (1991).

Defendants make no reasoned arguments that it was objectively reasonable, in light of Eleventh Circuit clearly established precedent, to believe that termination of Mr. Sherrod for publicly criticizing the District's African and African-American history infusion efforts and compliance with state law was lawful in 2004. [Indeed, defendants do not argue that Mr. Sherrod's speech interfered with the efficient public service of their employees so as to justify his termination in first instance; rather, they stand on their argument that his contract was terminated because of ongoing problems with his competency as a teacher.]

In short, no rational jury could conclude that it was objectively reasonable for defendants to believe that the termination of a public school teacher as a consequence of his vocal criticism of the school board's compliance with state law governing history curriculum content would not violate the employee's clearly established First Amendment rights. Since there is no genuine issue of material fact raised on this point, defendants are not entitled to summary judgment based on qualified immunity. *Cf. Herts v Smith*, 345 F.3d 581 (8th Cir. 2003)(genuine issue of material fact existed as to whether school district officials reasonably believe they were not violating employee's first amendment rights when they failed to renew their employment contract after she testified in desegregation case involving district).

### C. Count 3 - Defendants Evans-Pare, Middleton
### (Due process violation - witness suppression)

In Count 3, plaintiff alleges a procedural due process violation based on litigation conduct of the School Board attorneys defending *Sherrod*. Specifically, he alleges that the attorneys failed to alert him to the fact that a key witness, Christine Hall, the school administrator at Olympic Heights who submitted his initial unsatisfactory performance evaluation, was no longer employed by the District and had herself been involved in wrongful discharge litigation against the District. Because plaintiff operated under false assumption she still worked for the District, he mistakenly thought she could be subpoenaed through District offices, was allegedly frustrated in his ability to serve her trial subpoena and deprived of an opportunity to question her on material facts pertinent to his *Monell* theory of liability against the District.

Notably, in *Sherrod I,* Sherrod did not identify Hall as a witness on his own witness list, did not call or attempt to call her as a witness in his case in chief or in rebuttal, and did not alert the

39

court to any issue pertaining to subpoena service on Hall.

The court agrees with the defendant School Board that there is no evidence of an affirmative misrepresentation or suppression of evidence proffered in support of this claim. In addition, constitutional due process requirements do not include a duty to provide updated addresses for witnesses in civil litigation. To the extent that plaintiff articulates a possible violation of the Federal Rules of Civil Procedure or pretrial orders of this court governing exchange of witness information, those concerns are appropriately raised by contemporaneous motion for sanctions or other relief at the time of trial. Because plaintiff did not voice any complaint regarding his ability to subpoena Hall before or during the trial of Sherrod I , his objections are waived. In any event, they do not constitute facts potentially constituting a procedural due process violation. Accordingly, the court shall enter summary judgment in favor of defendants on the Fourteenth Amendment due process claim asserted in Count 5.

### D. Plaintiff's Cross Motion for Summary Judgment

Plaintiff has filed cross motion for summary judgment on his First Amendment retaliation claim against Superintendent Johnson, contending that the protected quality of his controversial speech is established as a matter of law, and that the jury finding, derived from special interrogatory verdict, in *Sherrod I,* to effect that the protected speech was a substantial or motivating factor behind Superintendent Johnson's decision to recommend his termination "must be left undisturbed," despite entry of order vacating the verdict and entering final judgment in favor of the District on other "issues of law." Presumably, plaintiff seeks to invoke collateral estoppel principles to preclude Superintendent Johnson from re-litigating issues pertaining to his allegedly unlawful motivation for his recommendation in *Sherrod II.*

Because the parties have not focused on the collateral estoppel effect, if any, available to Mr. Sherrod as a result of *Sherrod I* trial proceedings,  the court has determined to reserve ruling upon this issue until the time of trial.  Accordingly, plaintiff's request for partial summary judgment on the retaliation claim against defendant Johnson based on allegedly preclusive effect of jury verdict in *Sherrod I* shall be denied without prejudice to renew all issues and argument on this point at time of trial.

### IV. Decretal Provisions

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1.  The plaintiff's motion for extension of time to file supplement to summary judgment papers [DE# 163] is **GRANTED,** and plaintiff's supplemental response in opposition to defendants' motion for summary judgment [DE# 164] is  accepted for filing with full consideration on its merits.

2.  The defendants Crutchfield and School Board's motion for summary judgment on the due process and equal protection claims set forth in Count 1  [DE# 101 ] is **GRANTED.**

3.  The defendant School Board's motion for summary judgment on the first amendment retaliation claim set forth in Count 2  [DE# 101]  is **GRANTED** on ground of *res judicata*.

4.   The defendants Johnson and  Crutchfield's   motion for summary judgment on the first amendment retaliation claim set forth in Count 2  [DE# 93,101 ] is **DENIED**, with  adverse summary judgment  entered against them on the asserted affirmative defense of qualified immunity.

5.  The defendants Vicki Evans-Pare,  Jean Marie Middleton and School Board's  motion for summary judgment on the Fourteenth Amendment procedural due process claim set forth in Count 3  [DE# 101] is **GRANTED**.

6.  Plaintiff Curtis Sherrod's cross motion for summary judgment on the First Amendment retaliation claim set forth in Count 2 as against defendant Johnson [DE# 106] is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 18  day of March, 2010.

Daniel T. K. Hurley
United States District Judge

cc. All counsel